## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**NORBERTO MEDINA RODRIGUEZ**,

      Plaintiff,

      v.

**CANÓVANAS PLAZA RIAL**
**ECONO RIAL, LLC**
**PANADERÍA Y REPOSTERÍA LA**
**SEVILLANA, INC.,**

      Defendants.

Civil No. 17-1943 (BJM)

## OPINION AND ORDER

Norberto Medina Rodriguez ("Medina") brought this action against Canóvanas Plaza Rial, Econo Rial, LLC ("Econo")[1], and Panadería y Repostería La Sevillana, Inc. ("La Sevillana") (collectively, "defendants"), alleging unlawful discrimination in a place of public accommodation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"). On August 30, 2019, parties filed cross motions for summary judgment. Dkts. 177, 182. I denied defendants' motion and granted Medina's motion in part. Dkt. 221. I also declined to rule on certain portions of parties' motions and granted time for one additional deposition. *Id.* at 10. Medina moved for partial summary judgment again after completion of that deposition, Dkt. 247, and defendants opposed, Dkt. 277. Medina replied, Dkt. 282, and defendants submitted a surreply, Dkt. 293. Although defendants did not move for summary judgment a second time, they renewed their arguments regarding mootness. *See* Dkt. 277 at 7, 10. This case is before me by consent of the parties. Dkts. 17, 18.

For the reasons set forth below, Medina's motion for partial summary judgment is **DENIED**. I also find that Medina's claim is moot as it relates to the installation of signs in defendants' parking lot. Further, Medina is ordered to show cause, within ten days of this order,

---

[1] J Rial LLC is the successor corporation of Econo Rial, LLC. Although the proper party has been substituted, for ease, this opinion refers to J Rial LLC as "Econo." *See* Dkt. 248.

why his claim as it relates to the size of the van accessible parking spaces should not be dismissed for want of standing.

## BACKGROUND

Before proceeding to summarize the record, I will explain which portions of the record I can consider. Designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," Local Rule 56 requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record, which the movant contends are uncontested and material. *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008); D.P.R. L. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. D.P.R. L. Civ. R. 56 (c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). While the "district court may forgive a party's violation of a local rule," litigants ignore the local rule "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

Medina's motion for summary judgment was accompanied by a statement of uncontested facts ("PSUF"), Dkt. 247-1, to which defendants responded, Dkt. 278. I have disregarded statements of fact, denials, and qualifications that were not supported by a record citation. *See Davila v. Potter*, 550 F. Supp. 2d 234, 239 (D.P.R. 2007). I have also disregarded legal conclusions presented as statements of fact. Additionally, I do not consider the declaration of Richard Acree, a proffered expert for defendants, because defendants never provided Medina with an expert report and thus failed to comply with Federal Rule of Civil Procedure 26(a)(2). *See* PSUF ¶ 52; Fed. R. Civ. P. 26(a)(2)(B) (requiring disclosure of an expert witness report, which contains "a complete statement of all opinions the witness will express and the basis and reasons for them; the facts or data considered by the witness in forming them; any exhibits that will be used to summarize or support them; the witness's qualifications, including a list of all publications authored in the previous 10 years; a list of all other cases in which, during the previous 4 years, the witness testified

as an expert at trial or by deposition; and a statement of the compensation to be paid for the study and testimony in the case."). Medina argues that I may not consider the declaration of Arturo Mayol Corretjer ("Mayol") for similar reasons, contending that Mayol is offered as an expert witness with none of the required disclosures. Medina is correct that I cannot consider Mayol's statement to the extent he is offered as an expert. However, defendants may offer Mayol as a lay witness capable of testifying to the fact that his company was hired to perform construction services for Econo, he measured defendants' accessible parking spaces, and he determined that the parking spaces are 96 inches wide and that the access aisles are 60 inches wide. None of this testimony constitutes an opinion, whether lay or expert, and it is all based on personal knowledge. *See* Dkt. 72-1 ¶¶ 3, 6, 11, 12, 15; *see also Langer v. Wasserman*, No. CV 18-2321-MWF-AS, 2019 WL 7900038, at *3 (C.D. Cal. Nov. 26, 2019) (collecting cases finding that a lay witness can properly testify to measurements she took in an ADA case). Finally, I cannot consider the deposition transcript of Julio Bonilla Rivera ("Bonilla"), as that transcript is provided in Spanish without English translation. *See* Dkt. 277-1; *Puerto Ricans For Puerto Rico Party v. Dalmau*, 544 F.3d 58, 67 (1st Cir. 2008) (quoting 48 U.S.C. § 864) ("All pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language."). For the same reason, I cannot consider the exhibits at docket numbers 277-3 or 278-1.

Medina reports suffering from osteoarthritis, which limits his mobility and causes pain in his legs. Dkt. 182-4 ("Medina Decl.") ¶¶ 2–3. On November 15, 2016, Medina visited Canóvanas Plaza Rial, a shopping center where Econo operates a supermarket and where La Sevillana operates a bakery. *See id.* ¶ 5. The parking lot at the shopping center services both the supermarket and the bakery. PSUF ¶ 17. It includes several parking spaces intended for visitors with disabilities. *Id.* ¶ 18.

When Medina arrived at the shopping center, he parked in a parking space designated as accessible. Medina Decl. ¶ 5. According to Medina, the parking space was missing a sign and had confusing pavement markings. *Id.* He also found that the parking space and access aisle were both

too small, estimating that they each measured less than 96 inches. *Id.* As a result, he found it difficult but not impossible to access the shopping center. *Id.*

On July 11, 2017, Medina filed suit, seeking injunctive relief under the ADA related to various aspects of defendants' property, including the parking lot.  Dkt. 1. As litigation progressed, Medina's attorney hired Pedro L. Alfaro del Toro ("Alfaro"), who maintains an architectural consulting practice, to offer an expert opinion on defendants' ADA compliance. PSUF ¶¶ 1–3. Alfaro visited the property on July 4, 2018, and again on April 3, 2019, and prepared reports to document his observations and opinions regarding the property. *Id.* ¶¶ 15–16. Medina's motion for partial summary judgment is based primarily on Alfaro's April 3 visit and related report, which also includes photographs of the parking lot. *See* Dkt. 182-2 at 16–31.

Alfaro observed that the parking lot includes nine parking spaces intended for disabled visitors, including two spaces for vans and seven for cars. *Id.* at 17. Four of these spaces are close to the bakery. *Id.* Alfaro observed that, of these four spaces, only two were marked with the international symbol of accessibility, and neither of these signs was centered. *Id.* Alfaro also examined five spaces in proximity to the supermarket. *Id.* at 22. Two of these were for vans and three for cars. *Id.* He observed that visitors using the three car spaces must maneuver behind parked cars to access the supermarket entrance, and he recommended that these spaces be relocated to avoid this arrangement. *Id.* Similarly, Alfaro stated that two van spaces were not in close proximity to an accessible route, and he recommended that these spaces be relocated such that visitors who use them do not have to cross through vehicular traffic lanes to access the supermarket entrance. *Id.* He also observed that one of the car spaces was missing a sign, and the two signs that were present were not centered. *Id.* at 23. Additionally, Alfaro found that the van spaces measured 126 inches and had 65-inch access aisles. *Id.* at 25–26. He described the pavement markings as faded and confusing and referred to the asphalt as rough and unstable. *See, e.g., id.* at 24. Alfaro also opined that the parking lot was improperly maintained and stated that historical satellite imagery indicated that the parking lot has been non-compliant in the past. *Id.* at 11–12.

On April 16, 2019, defendants' attorney sent an email to Medina's attorney representing that defendants do not have internal policies related to ADA compliance efforts and that lease agreements among defendants do not delineate responsibility for ADA compliance as related to the parking lot or other accessible features. Dkt. 182-3.

On September 12, 2019, Bonilla, Econo Store Manager, prepared a declaration. Dkt. 189-1 ("Bonilla Decl."). Bonilla stated that the shopping center is undergoing a reconstruction process, which will contemplate ADA compliance. *Id.* ¶¶ 3, 9. He also stated that the parking lot is painted and repaved as part of an unwritten maintenance program and that Econo maintains unwritten policies to ensure ADA compliance. *Id.* ¶¶ 6, 8, 12. Bonilla also explained that all accessible parking spaces had their corresponding signs and that the marking of the van accessible spaces had been relocated to provide an additional two inches. *Id.* ¶¶ 4–5, 7. Attached to Bonilla's declaration are photographs, which he took. *Id.* ¶ 2. These depict accessible parking spaces, all of which have their corresponding signs. *Id.* at 6–9.

Mayol, Executive Vice-President of Bellagio Corp., also prepared a declaration. *See* Dkt. 72-1. Mayol stated that his company was hired to improve defendants' property and that he has personally confirmed certain measurements in the parking lot. *Id.* ¶¶ 3, 6, 15. According to Mayol, the parking lot has five accessible standard spaces and two van accessible spaces. *Id.* ¶ 10. The spaces measure at least 96 inches wide, and the access aisles measure at least 60 inches wide. *Id.* ¶¶ 11–12.

Two former supermarket employees also offered declarations. Each of them declared that, during their time working for the supermarket, the pavement markings in accessible spaces were always faded, they never observed recurrent maintenance to the parking lot, and they were never aware of any policies related to ADA compliance. Dkt. 247-3 ("García Decl.") ¶¶ 5, 8–9; Dkt. 247-4 ("Muñiz Decl.") ¶¶ 4, 7.

Medina now seeks judgment that various aspects of the parking lot violate the ADA and that defendants must establish and implement ADA compliance policies. Defendants contend that portions of Medina's claim are moot.

# DISCUSSION

As a preliminary matter, I will address defendants' contention that portions of Medina's claim are moot because defendants have cured certain deficiencies outlined in Medina's complaint.

Article III of the United States Constitution empowers federal courts to hear actual cases or controversies. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc*., 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). The burden of establishing mootness rests with the party invoking the doctrine. *Am. Civil Liberties Union of Massachusetts v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013) (citing *Conservation Law Found. v. Evans*, 360 F.3d 21, 24 (1st Cir. 2004)).

When a defendant voluntarily ceases the offending activity, courts impose additional requirements to prevent a "manipulative litigant" from simply "altering its behavior long enough to secure a dismissal and then reinstating it immediately after." *Id.* at 54–55 (citations omitted). Thus, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 190 (2000). This exception to mootness is "highly sensitive to the facts of a given case." *Catholic Bishops*, 705 F.3d at 56.

In the instant case, defendants urge that portions of Medina's claim related to defendants' parking lot are moot. In support of this position, they submit Bonilla's declaration, prepared on September 12, 2019, as well as photographs of the challenged parking lot. *See* Dkt. 189-1. Bonilla attests that all accessible parking spaces have their corresponding signs, that the van accessible aisle has been relocated to provide two additional inches, and that the parking lot is maintained as part of an unwritten maintenance program. *Id.* The photographs depict several parking spaces at the challenged property, all with their corresponding signs. *See id.* at 6–9. Defendants also offer Mayol's declaration. *See* Dkt. 72-1. Mayol states that his company has been hired to improve the

property and that he has personally confirmed certain measurements in the parking lot. *Id.* ¶¶ 3, 6, 15. According to Mayol, the accessible spaces measure at least 96 inches wide, and the access aisles measure at least 60 inches wide. *Id.* ¶¶ 11–12.

Medina counters that, even if defendants show the current configuration of the parking lot meets ADA requirements, recurrence of ADA violations is likely because defendants lack policies to ensure ADA compliance and because the parking lot has been non-compliant and poorly maintained in the past. He offers an expert report—prepared after an April 3, 2019 visit to the property—which catalogues various ADA violations in the parking lot, including the absence of certain signs, faded pavement markings, and van accessible spaces that fail to meet ADA spacing requirements. *See* Dkt. 182-2 at 15–35. He also offers the declarations of two former supermarket employees who both state that, during their time working for the supermarket, the pavement markings in accessible spaces were always faded, they never observed recurrent maintenance to the parking lot, and they were never aware of any policies related to ADA compliance. Dkt. 247-3 ("García Decl.") ¶¶ 5, 8–9; Dkt. 247-4 ("Muñiz Decl.") ¶¶ 4, 7.

I find that Medina's claim is moot with respect to the absence of signs in accessible parking spaces. Bonilla attests that all accessible spaces have their signs, the photographs corroborate this assertion, and Medina has not seriously challenged this fact. Because the accessible parking spaces now have signs, an injunction requiring their installation would be meaningless. Moreover, recurrence of this violation is highly unlikely given that, to resume the unlawful conduct, defendants would need to affirmatively remove structural improvements from the property. *See, e.g., Davis v. Morris-Walker, LTD,* 922 F.3d 868, 870 (8th Cir. 2019) ("[A] defendant's permanent physical improvements—such as the installation of parking spaces, ramps, pull and grab bars, and chair lifts—are sufficient to eliminate a case or controversy if they provide the requested relief."); *Wright v. RL Liquor*, 887 F.3d 361, 363 (8th Cir. 2018) (ADA claim properly deemed moot where facility had made structural changes, including installing a sign in an accessible parking space and painting a van accessible parking space); *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1022–23 (7th Cir. 2016) (installation of ADA-compliant restroom mooted ADA claim as it

was a structural alteration that would be difficult to undo); *see also Langer v. Nenow*, No. 18-CV-01670-GPC-BGS, 2020 WL 708144, at *3 (S.D. Cal. Feb. 12, 2020) (collecting cases and noting that "[c]ourts are more likely to find a matter moot on the basis of a voluntary cessation where the defendant remedies a 'structural modification'"). Medina's claim regarding the absence of signs in accessible spaces is therefore moot.

Defendants have not met their burden, however, regarding the size of the van accessible parking spaces. Bonilla's declaration offers no details regarding the current measurement of the van accessible spaces and their aisles other than to say that two inches have been added. And the court certainly cannot know the exact measurement of those spaces based on a photograph alone. Likewise, Mayol's declaration fails to offer any details specific to van accessible spaces, asserting only that accessible spaces are at least 96 inches wide with 60-inch access aisles. Dkt. 72-1 ¶¶ 11–12. But van accessible spaces must measure either 96 inches with a 96-inch access aisle or they may be 132 inches with a 60-inch access aisle. 2010 Standards §§ 502.2, 502.3; 1991 Standards § 4.1.2(5)(b), app. A4.6.3. Defendants thus have not established that the van spaces currently meet ADA requirements, let alone that "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190.[2]

Nor have defendants met their burden regarding parking lot maintenance. Bonilla attests that defendants paint and repave the parking lot as part of an unwritten maintenance program and that defendants otherwise maintain unwritten policies to assure ADA compliance. Bonilla further asserts that the parking lot is undergoing a reconstruction and remodeling process, which will contemplate ADA compliance. Mayol corroborates these assertions. But promises such as these are insufficient to show that the ADA violation could not reasonably be expected to recur. Unlike a sign, which would need to be affirmatively removed for a violation to recur, the painting and surfacing of a parking lot can deteriorate merely by virtue of the passing of time. *See Lozano v. C.A. Martinez Family Ltd. P'ship*, 129 F. Supp. 3d 967, 971 (S.D. Cal. 2015) ("Defendants could

---

[2] Nonetheless, as explained below, I will not address this portion of Medina's claim unless Medina shows that he has standing to challenge the van accessible spaces.

run afoul of the ADA in the future by mere inaction and allowing the paint on the accessible spaces to fade."). And while Medina has offered evidence indicating that defendants' parking lot has been non-compliant in the past, defendants have offered no evidence to counter that view. *See Johnson v. Tackett*, 272 F. Supp. 3d 1198, 1204 (E.D. Cal. 2017) (ADA claim was not moot given "defendants' failure to address a claimed history of ADA non-compliance, coupled with the common sense observation that repaved and restriped parking spaces fade over time and thus require repeated resurfacing"). Nor have defendants offered any other evidence sufficient to show that the problem of faded and confusing pavement markings could not otherwise be expected to recur. *See, e.g., Johnson v. Oishi*, 362 F. Supp. 3d 843, 849 (E.D. Cal. 2019) (defendants could show ADA claim was moot where they had entered an agreement with a contractor to repaint the parking lot annually regardless of whether paint had faded). Further, even if defendants maintain unwritten policies to assure ADA compliance and parking lot upkeep—a fact that Medina hotly contests—policies can easily be rescinded or go unenforced. Their existence is thus insufficient to moot an ADA claim. *See Moeller v. Taco Bell Corp.*, 816 F. Supp. 2d 831, 860 (N.D. Cal. 2011) (even assuming defendants' ADA compliance policies were facially sufficient and enforced, such policies could not moot ADA claim because defendant could "change or rescind its policies at any time").

Accordingly, Medina's claim regarding the absence of signs in the parking lot is moot, but his other challenges to the parking lot present live controversies.

Next, I address Medina's motion for partial summary judgment. "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)). The moving party bears a two-fold burden: it must show that there is "no genuine issue as to any material facts" and that it is "entitled to judgment as a matter of law." *Veda-Rodriguez v. Puerto Rico*, 110 F.3d 174, 179 (1st Cir. 1997). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,*

*Inc*., 477 U.S. 242, 248 (1986). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co*., 398 U.S. 144 (1970). That party must "inform[] the district court of the basis for its motion, and identify[] those portions" of the record "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotations omitted).

On a motion for summary judgment, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood...." *Greenburg v. Puerto Rico Mar. Shipping Auth*., 835 F.2d 932, 936 (1st Cir. 1987). Rather, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Here, Medina seeks partial judgment that various portions of defendants' parking lot fail to comply with ADA design standards and that defendants must implement certain policies. More specifically, Medina appears to seek partial summary judgment finding as follows: (1) that certain signs marking accessible spaces violate the ADA because they are not centered; (2) that accessible parking spaces and aisles violate the ADA because of inadequate pavement markings; (3) that

defendant's parking lot is inadequately maintained in violation of the ADA; (4) that the ADA requires defendants to establish and implement policies to ensure ADA compliance; (5) that various accessible parking spaces violate the ADA because they are not in close proximity to the accessible access route and individuals who park in these spaces must cross through vehicular traffic lanes to access the main building; and (6) that two van accessible spaces violate ADA because they are 126 inches wide with an adjacent 65-inch wide demarcated access aisle.

 "Congress enacted the ADA 'to address the major areas of discrimination faced day-to-day by people with disabilities,' hoping 'to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals.'" *Dudley v. Hannaford Bros. Co*., 333 F.3d 299, 303 (1st Cir. 2003) (quoting 42 U.S.C. § 12101(a)(8), (b)(4)). Title III of the ADA "prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations." *Spector v. Norwegian Cruise Line Ltd*., 545 U.S. 119, 128 (2005). To establish a prima facie case pursuant to Title III, a plaintiff "must demonstrate that (1) he or she has a qualified disability under the ADA, (2) the defendant operates a place of public accommodation, and (3) the plaintiff was discriminated against as a result of his or her disability." *Medina-Rodriguez v. Fernandez Bakery, Inc*., 255 F. Supp. 3d 334, 341 (D.P.R. 2017) (citing cases). Because plaintiffs bringing suit under Title III may pursue only injunctive relief, they must also show that the discrimination poses "some ongoing harm (or, at least, a colorable threat of future harm)." *Dudley*, 333 F.3d at 304. The present motion seeks partial judgment related only to defendants' alleged discrimination.[3]

For public accommodations constructed after January 26, 1993 ("new construction"), discrimination includes the failure to design and construct facilities that are "readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12183(a). Generally, this means that new

---

[3] Parties do not dispute that defendants operate public accommodations, and the question of Medina's disability is reserved for trial. *See* Dkt. 221 at 16, 18.

construction must comply with the standards for accessible design promulgated by the Attorney General. *See* 28 C.F.R. § 36.406(a).

The Attorney General promulgated design standards in 1991 [4] and again in 2010 [5] (collectively "the Design Standards"). These standards "apply in phases." *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co*., 765 F.3d 1205, 1217 (10th Cir. 2014). Public accommodations constructed or altered after January 26, 1993, but before September 15, 2010, must comply with the 1991 Standards. 28 C.F.R. § 36.406(a) app. Those constructed or altered between September 15, 2010, and March 15, 2012, may comply with either the 1991 or 2010 Standards. *Id.* And those constructed or altered after March 15, 2012, must comply with the 2010 Standards. *Id.* Additionally, for public accommodations subject to the 1991 Standards, if the 2010 Standards "reduce the technical requirements" that the 1991 Standards impose, then that facility need only comply with the 2010 Standards. *Id.* § 36.211(c). Finally, the 2010 Standards include the following "safe harbor" provision:

> Elements that have not been altered in existing facilities on or after March 15, 2012 and that comply with the corresponding technical and scoping specifications for those elements in the 1991 Standards are not required to be modified in order to comply with the requirements set forth in the 2010 Standards.

*Id.* § 36.304. *See, e.g., Rush v. Hyun Suk Kim*, 908 F. Supp. 2d 1117, 1119 n.2 (C.D. Cal. 2012) (where a facility was constructed prior to March 15, 2012, and had not since been altered, it did not violate the ADA if it complied with the 1991 Standards).

It appears that the public accommodation challenged here was constructed after January 26, 1993, and before September 15, 2010. *See* Dkt. 62 ¶ 14 (amended complaint alleging the property was constructed after January 26, 1993); Dkts. 102, 112, 113 ¶ 14 (defendants' answers admitting the property was constructed after January 26, 1993); Dkt. 182-1 ¶ 25 (stating that Defendant Sevillana was established in March 1999); Dkt. 189 at 29 (admitting that Sevillana was

---

[4] The 1991 Standards appear in Appendix D to 28 C.F.R. part 36.
[5] The 2010 Standards appear in Appendices B and D to 36 C.F.R. part 1191, and also include the requirements of subpart D of 28 C.F.R. part 36.

established in 1999 for purposes of summary judgment); *see also* Dkt. 93-1 ¶ 3 (statement under penalty of perjury by President of La Sevillana explaining that La Sevillana was established in 1999); Dkt. 247-1 ¶ 47 (satellite image purporting to represent conditions of the parking lot from 2003 to August 2017); Dkt. 247-3 ¶ 2 (statement under penalty of perjury by former employee of Econo supermarket stating that he began working at the supermarket in October 2003). Typically, this would mean that the 1991 Standards apply, unless the facility was altered after March 15, 2012. Medina, however, has moved for summary judgment based on the facility's alleged violation of the 2010 Standards. And defendants have responded with reference to the 2010 Standards. Neither party raises any argument regarding which standards apply. Nevertheless, as explained below, the outcome of this motion is the same, regardless of whether the 1991 or 2010 Standards apply.

To start, I will address Medina's contention that he is entitled to judgment that defendants' parking lot violates the ADA because certain signs marking accessible parking spaces are not centered. Medina cites no law that requires signs to be centered. The Design Standards require public accommodations to identify accessible parking spaces with signs showing the international symbol of accessibility. 2010 Standards §§ 502.6, 703.7.2.1; 1991 Standards §§ 4.6.4, 4.30.7. Signs identifying van parking spaces must include a "van accessible" designation. 2010 Standards § 502.6; 1991 Standards § 4.6.4. And signs must be at least 60 inches above the ground. 2010 Standards § 502.6. Medina has not demonstrated that the ADA imposes a centering requirement. Accordingly, he is not entitled to summary judgment on this issue.

Next, Medina seeks judgment that defendants' accessible parking spaces and aisles violate the ADA because pavement markings are faded and confusing. Under the 1991 Standards, "[i]f parking spaces are provided for self-parking by employees or visitors, or both, then accessible spaces complying with 4.6 shall be provided in each such parking area." *See* 1991 Standards § 4.1.2(5)(a). Section 4.6, in turn, does not impose requirements related to pavement markings. *See id.* § 4.6. The 2010 Standards state that accessible parking spaces must comply with Section 502. 2010 Standards § 208.2. Section 502, in turn, requires that accessible spaces be marked to define

their width. 2010 Standards § 502.3.3. Further, access aisles must be "marked so as to discourage parking in them." 2010 Standards § 502.3.3. And an advisory note provides as follows:

> The method and color of marking are not specified by these requirements but may be addressed by State or local laws or regulations. Because these requirements permit the van access aisle to be as wide as a parking space, it is important that the aisle be clearly marked.

2010 Standards § 502.3.3, Advisory 502.3.3 Marking. These provisions do not expressly prohibit faded paint. However, because they require that aisles be marked so as to discourage parking in them, markings must not confuse visitors to such a degree that a non-disabled customer would feel free to park in a space intended for disabled customers.

Parties point to conflicting evidence related to the clarity of the pavement markings. Medina's expert witness, Alfaro, described the pavement and aisle markings as faded and confusing, Dkt. 182-2 at 17, 23–27; some of the parking spaces depicted in the photographs in Alfaro's report appear to be faded, *id.* at 18–19, 23–27; and two former supermarket employees state that, during their time working for the supermarket, they observed that the pavement markings in accessible spaces were faded, Dkt. 247-3 ("García Decl.") ¶¶ 8–9; Dkt. 247-4 ("Muñiz Decl.") ¶ 7. On the other hand, Medina admitted during deposition that, upon visiting the parking lot subsequent to filing suit, he identified the handicap spaces without difficulty, Dkt. 192-1 at 35; Alfaro stated during deposition that he identified the accessible parking spaces without difficulty, Dkt. 192-2 at 47; and a reasonable jury might conclude that the photographs in Alfaro's report depict parking spaces that are clearly marked and easily identifiable, *see* Dkt. 182-2 at 8–19, 23–27. Accordingly, Medina is not entitled to summary judgment on this issue.

Medina also seeks judgment that defendant's parking lot is inadequately maintained in violation of 28 C.F.R. § 36.211(a), which provides as follows: "[a] public accommodation shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities." 28 C.F.R. § 36.211(a). "This section recognizes that it is not sufficient to provide features such as accessible routes, elevators, or ramps, if those features are not maintained in a manner that enables individuals with disabilities

to use them." 28 C.F.R. pt. 36, App. C, § 36.211; *see also* Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 73 Fed. Reg. 34508-01, 34523, 2008 WL 2413721 (June 17, 2008) ("It is not sufficient for a building or other feature to be built in compliance with the ADA, only to be blocked or changed later so that it is inaccessible."). The DOJ has offered several examples illustrating when a violation under this provision occurs. A public accommodation violates this provision if it installs a vending machine on an accessible route in a manner that obstructs the route, places ornamental plants in an elevator lobby such that they "block the approach to the elevator call buttons or obstruct access to the elevator cars," fails to promptly repair broken elevators or automatic doors, turns off an elevator during business hours to save energy, or deactivates accessible automatic doors because of inclement weather. Dep't of Justice, Technical Assistance Manual § III–3.7000.5, available at http://www.ada.gov/taman3.html (last visited July 6, 2020). In each case, the failure to maintain relates to a facility's "obligation to ensure that facilities are readily accessible to and usable by individuals with disabilities." *Id.*; *see also* 42 U.S.C. § 12183(a)(1) (discrimination occurs when a public accommodation is not "readily accessible to and usable by individuals with disabilities").

> In the case of parking lots, the DOJ has offered the following guidance:
>
> In order for an accessible parking space to be usable, all elements of the space must be free of obstructions: the vehicle space, the access aisle, the curb ramp, and the route that connects the parking to the accessible entrance of the building. Lack of maintenance of any one of those elements can make the whole space inaccessible. For example, for a wheelchair user to exit her car, she must place her wheelchair in the access aisle, transfer from the car seat to her wheelchair, and then roll backward in the access aisle to provide clearance to close the car door. If another car parks in the aisle or if a plow loads the aisle with snow, the wheelchair user does not have sufficient room to get out of her car. That parking space the owner just paid to have correctly restriped is now useless to her.

Dep't of Justice, Maintaining Accessible Features in Retail Establishments, available at https://www.ada.gov/business/retail_access.htm (last visited July 6, 2020). The DOJ thus advises business owners to remove obstacles from accessible spaces and aisles, including snow, ice, mud, leaves, shopping carts, and cars without designated handicapped placards. *Id.* Additionally, one court has found that a violation of 28 C.F.R. § 36.211(a) occurred where "the painted surface of

the accessible parking spots had faded to the point that the markings were nonexistent or barely visible." *Lozano*, 129 F. Supp. 3d at 973. This makes sense, given that such severe fading would render a facility not readily accessible to disabled visitors, as non-disabled visitors might feel entitled to park in those spaces.

A dispute remains regarding the degree to which the accessible parking spaces in defendants' lot are maintained, precluding summary judgment on this issue. Medina's expert witness described the property as poorly maintained, observed faded and confusing pavement markings, determined that the parking lot has not been maintained historically, and found various portions of the asphalt to be rough and unstable. Dkt. 182-2 at 22–27. Two former supermarket employees stated that the pavement markings in accessible spaces were always faded and that they never observed recurrent maintenance to the parking lot, Dkt. 247-3 ("García Decl.") ¶¶ 8–9; Dkt. 247-4 ("Muñiz Decl."). And defendants' attorney sent an email to Medina's attorney representing that defendants do not have internal policies related to ADA compliance efforts and that lease agreements among defendants do not delineate responsibility for ADA compliance. Dkt. 182-3. On the other hand, the supermarket store manager states that the parking lot is painted and repaved as part of a maintenance program and that defendants maintain unwritten policies to assure ADA compliance. Bonilla Decl. ¶¶ 6, 8, 12. Further, defendants contend that the photographs in Alfaro's report depict accessible parking spaces that are identifiable and in working condition. *See* Dkt. 182-2 at 8–19, 23–27. Given the record evidence as a whole, I agree that reasonable minds could differ regarding the severity of fading depicted in Alfaro's photographs and regarding whether the parking lot is in fact maintained "in operable working condition." Accordingly, Medina is not entitled to summary judgment on this question.

Next, Medina seeks judgment that the ADA requires defendants to establish and implement policies to ensure ADA compliance. But he cites no authority suggesting that the ADA imposes such a requirement. Rather, the only authority he cites refers to a requirement "that any 'policies, practices, or procedures' of a public accommodation be reasonably modified for disabled 'individuals' as necessary to afford access unless doing so would fundamentally alter what is

offered." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)). This requirement applies in situations where public accommodations maintain certain policies that discriminate against individuals with disabilities, for instance, by prohibiting service animals. Thus, where a golf association maintained a policy that required golfers to walk the green, the ADA required the association to modify that policy to permit qualifying individuals to use golf carts. *Id.* at 698–90. But the provision Medina cites does not impose an affirmative requirement that all public accommodations maintain ADA compliance policies.

To the contrary, DOJ guidance expressly leaves it to public accommodations to determine how best to assess their compliance as "appropriate to the particular circumstances faced by the wide range of public accommodations covered by the ADA." 28 C.F.R. Pt. 36, App. C, § 36.304. Although the DOJ "*urges* public accommodations to establish procedures for an ongoing assessment of their compliance with the ADA's barrier removal requirements" and "*recommends* that this process include appropriate consultation with individuals with disabilities or organizations representing them," it has expressly "declined to establish any independent requirement for an annual assessment or self-evaluation." *Id.* (emphasis added); *see also Mielo v. Steak 'n Shake Operations, Inc*., 897 F.3d 467, 478 (3d Cir. 2018) ("The text of the ADA seems to suggest, then, that disabled patrons like Mielo and Heinzl are better served when [public accommodations] are required to spend their limited financial resources on correcting only the access violations that disabled patrons have actually brought to the [facility's] attention—rather than requiring those establishments to expend their limited resources in an ongoing search for potential violations that may not exist."); *Murphy v. Aaron's, Inc*., No. 19-CV-00601-CMA-KLM, 2020 WL 2079188, at *6 (D. Colo. Apr. 30, 2020) ("Title III does not permit injunctive relief requiring modification or implementation of policies of proactive inspection and correction of undiscovered access barriers."); *Mielo v. Steak 'N Shake Operations, Inc*., No. CV 15-180, 2019 WL 1330836, at *8 (W.D. Pa. Mar. 25, 2019) (explaining that "a public accommodation can fulfill [its duties under the ADA] by making repairs when it finds problems or when problems are brought to its attention, which is not the same proposition as requiring it to create a policy to inspect for such problems").

Accordingly, Medina is not entitled to judgment that the ADA requires defendants to establish and implement ADA compliance policies.

Medina also seeks judgment that the current location of five parking spaces violates the ADA. According to Medina, three car accessible spaces near the supermarket must be relocated because visitors using these spaces must maneuver behind parked cars and into a vehicular traffic lane to approach the entrance and because one space is located on a traffic lane corner. *See* Dkt. 182-2 at 23 (photograph depicting the three challenged spaces, designated as spaces 5, 6, and 7 by Medina's expert witness). Defendants do not dispute, as a factual matter, the location of these parking spaces. Rather, they argue that the spaces need not be relocated as a matter of law. I agree.

Two provisions of the 2010 Standards are potentially relevant here.[6] Section 208.3.1 requires that accessible parking spaces be "located on the shortest accessible route" to an ADA-compliant entrance, and section 502.3 provides that "access aisles serving parking spaces" must "adjoin an accessible route." *See also* 1991 Standards § 3.5 (defining "accessible route" as "[a] continuous unobstructed path connecting all accessible elements and spaces of a building or facility"); 28 C.F.R. § 36.403(e)(1) (defining "path of travel" as "a continuous, unobstructed way of pedestrian passage by means of which the altered area may be approached, entered, and exited, and which connects the altered area with an exterior approach (including sidewalks, streets, and parking areas), an entrance to the facility, and other parts of the facility.")). The advisory comment following section 502.3 states as follows:

> Accessible routes must connect parking spaces to accessible entrances. In parking facilities where the accessible route must cross vehicular traffic lanes, marked crossings enhance pedestrian safety, particularly for people using wheelchairs and other mobility aids. *Where possible*, *it is preferable* that the accessible route not pass behind parked vehicles.

2010 Standards § 502.3, Advisory 502.3.3 Access Aisle (emphasis added); *see also* 28 C.F.R. § 36.406(b) (explaining that advisory notes "do not establish enforceable requirements"). Here, Medina does not offer evidence suggesting that the parking spaces are too far from the entrance or

---

[6] The 1991 Standards impose the same requirements. *See* 1991 Standards §§ 4.6.2, 4.6.3.

that they lack access aisles. Rather, he contends that the spaces do not adjoin an accessible route because an accessible route, as a matter of law, cannot require visitors to pass behind parked cars. This interpretation runs contrary to section 502.3 of the 2010 Standards, which "contemplates that an accessible route may 'pass behind parked vehicles' or even 'cross vehicular traffic lanes.'" *Boitnott v. Border Foods, Inc.*, 361 F. Supp. 3d 858, 866–67 (D. Minn. 2019) (citing 2010 Standards § 502.3); *see also Elguezabal v. GBG Properties Two LLC*, No. EDCV1801242ABKKX, 2019 WL 6792815, at *2–3 (C.D. Cal. Oct. 2, 2019) (collecting cases). "That the 2010 Standards express a preference to avoid such configurations is prudent." *Boitnott*, 361 F. Supp. 3d at 866. "However, that preference does not establish that it is a violation of the ADA for an accessible route to pass behind parked vehicles." *Id.* Because Medina has failed to show that, as a matter of law, the ADA requires relocating the challenged spaces, he is not entitled to summary judgment on this question.

Medina also seeks judgment finding that the location of two van accessible spaces violates the ADA. Medina's only evidence suggesting a problem with the location of the van accessible parking spaces is an expert report that states as follows: "Two (2) [parking spaces] for vans outside the main building's accessible access route creat[e] potentially hazardous conditions [by] forcing [visitors] to cross through vehicular traffic lanes. . . . Where they do not comply is with ADA Title III - Section 502.4.1 because they are not in close proximity to the accessible access route."[7] Dkt. 182-2 at 22. The photographs provided in that same expert report depict van accessible spaces located across from the supermarket entrance. *See id.* at 26. The report itself fails to explain what it is about the current route from the van spaces to the entrance that makes it inaccessible, other than to assert that the route crosses vehicular traffic lanes. As explained above, however, the Design Standards contemplate that accessible routes may cross vehicular traffic lanes. *See Boitnott*, 361 F. Supp. 3d at 866–67. And Medina has provided no other evidence suggesting that the route from the van spaces to the entrance is inaccessible. Nor has Medina pointed to evidence regarding

---

[7] Section 502.4 of the 2010 Design Standards refers to floor and ground surfaces rather than to a parking space's proximity to an accessible route.

the distance between the current location of the van accessible spaces and the supermarket entrance as compared to the distance from the proposed relocation site to an ADA-compliant entrance. Accordingly, he is not entitled to summary judgment that the location of the van accessible spaces violates the ADA.

Finally, Medina seeks judgment that two van accessible spaces violate the ADA because they are 126 inches wide with an adjacent 65-inch wide demarcated access aisle. A van accessible space may either measure 96 inches with a 96-inch access aisle or 132 inches with a 60-inch access aisle. 2010 Standards §§ 502.2, 502.3; 1991 Standards § 4.1.2(5)(b), app. A4.6.3. Medina offers evidence from an expert witness who measured the van spaces and found that they measured 126 inches and had 65-inch access aisles. *See* Dkt. 182-2 at 25–26 (photographs of van spaces with measurements). Defendants contend that Alfaro measured the van spaces incorrectly, citing his deposition to show that that the space was measured from the inside of the line, rather than from the centerline, as required by law. *See* Dkt. 192-2 at 23; 2010 Standards § 502.1 ("Where parking spaces are marked with lines, width measurements of parking spaces and access aisles shall be made from the centerline of the markings."). Defendants assert that, had Alfaro properly measured the spaces, he would have found that the spaces measured 130 inches with 65-inch access aisles. According to defendants, this configuration does not constitute a barrier to access, as the space was only two inches smaller than required.

Defendants admit that the van spaces were two inches shorter than required by law and thus a "non-conforming element." Dkt. 277 at 9. Typically, failure to comply with the Design Standards constitutes discrimination under the ADA. *See, e.g., Oliver v. Ralphs Grocery Co*., 654 F.3d 903, 904–05 (9th Cir. 2011). This is true even when that failure is slight. Indeed, "'obedience to the spirit of the ADA' does not excuse noncompliance with the [Guidelines'] requirements," which "are as precise as they are thorough, and the difference between compliance and noncompliance with the standard of full and equal enjoyment established by the ADA is often a matter of inches." *Chapman v. Pier 1 Imports (U.S.) Inc*., 631 F.3d 939, 945–46 (9th Cir. 2011) (quoting *Long v. Coast Resorts, Inc*., 267 F.3d 918, 923 (9th Cir. 2001)).

Nonetheless, I decline to address this question at this juncture, as I have serious doubts regarding the court's jurisdiction to hear this portion of Medina's claim. To meet Article III standing requirements, a plaintiff must demonstrate the following:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of….Third, it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotations and citations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561. "In the context of Title III of the ADA, a plaintiff generally must 'show a real and immediate threat that a particular (illegal) barrier will cause future harm.'" *Disabled Americans For Equal Access, Inc. v. Ferries Del Caribe, Inc.*, 405 F.3d 60, 64 (1st Cir. 2005) (quoting *Dudley*, 333 F.3d at 305).

In light of the current record, I doubt that there is any real and immediate threat of injury to Medina based on this particular barrier, and I question whether any order regarding the size of the van spaces could provide him redress. In Medina's affidavit, he stated that he visited the shopping center on November 15, 2016, parked in a parking space designated as accessible, and found the space too small, estimating that it measured less than 96 inches. Medina Decl. ¶ 5. This made it difficult for Medina to navigate the parking space and adjacent aisle, which he also believed to be too small. *Id.* Neither Medina's affidavit nor his complaint states that he uses a van or that his disability otherwise requires him to access a van-accessible space. And although Medina states that the size of the van spaces might harm him if someone who owns a van gives him a ride to the shopping center, *id.* ¶ 9(i), that statement is purely speculative. *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (internal quotations and citations omitted) ("Abstract injury is not enough. . . . The injury or threat of injury must be both real and immediate, not conjectural or hypothetical."). Medina does not offer specific facts that would permit this court to conclude that an injury based on the size of the van spaces is actual or imminent—for instance, by showing that Medina has ever

visited the shopping center in a van. *See Lujan*, 504 U.S. at 561 (explaining that, at the summary judgment stage, plaintiffs must set forth "specific facts" to establish standing); *see also Doran v. 7–Eleven, Inc.*, 524 F.3d 1034, 1044 n. 7 (9th Cir. 2008) (explaining that a wheelchair-dependent plaintiff "may challenge only those barriers that might reasonably affect a wheelchair user's full enjoyment of the store"); *Steger v. Franco, Inc.*, 228 F.3d 889, 893 (8th Cir. 2000) (holding that a plaintiff who is not blind lacks standing to sue for ADA violations that only affect the blind); *Smith v. Geneva Properties LP*, No. 016CV02735JRTKMM, 2016 WL 7404744, at *4 n.5 (D. Minn. Nov. 29, 2016), *report and recommendation adopted*, No. CV 16-2735 (JRT/KMM), 2016 WL 7404692 (D. Minn. Dec. 21, 2016) ("The fact that Mr. Smith does not allege that he drives a van or that he intends to return to the property in a van raises serious concerns about whether the absence of a specifically marked van spot caused him any injury in fact."). Medina is hereby ordered to show cause why his claim, as it relates to the size of the van accessible spaces, should not be dismissed for want of standing.

## CONCLUSION

For the foregoing reasons, Medina's motion for partial summary judgment is **DENIED**. I also find that Medina's claim is moot insofar as it relates to the absence of signs in defendants' parking lot. Finally, Medina is ordered to show cause, within ten days of this order, why his claim as it relates to the size of the van accessible parking spaces should not be dismissed for lack of jurisdiction. Defendants shall respond within ten days thereafter.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 13th day of July 2020.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge